**KENTUCKY BAR ASSOCIATION,**
Movant

v.

Steven O. THORNTON, Respondent.

No. 2012–SC–000024–KB.

Supreme Court of Kentucky.

Feb. 21, 2013.

## *OPINION AND ORDER*

The Kentucky Bar Association (KBA) recommends that Steven O. Thornton, KBA Member No. 70895,[1] be suspended from the practice of law for 181 days, and that he be ordered to pay restitution in the amount of $7,383.33, as well as the costs associated with these proceedings. The Inquiry Commission consolidated three separate disciplinary cases against Thornton, involving fourteen alleged violations of the Kentucky Rules of Professional Conduct. The Trial Commissioner found that Thornton had committed eleven of the fourteen alleged violations and recommended the same punishment the KBA now recommends we impose. On appeal, the KBA Board of Governors agreed in all respects with the Trial Commissioner. Thornton subsequently requested review in this Court.

## I. BACKGROUND

### A. Charge 8632: Lesa Harrison

In December 1997, Lesa Harrison contacted Thornton to discuss claims relating to serious physical injuries inflicted upon her by her work supervisor and paramour, Micah Pendley. For this incident, Pendley was indicted for first-degree assault by a Warren County grand jury.

---

1. Thornton was admitted to practice law in the Commonwealth of Kentucky on November 1, 1983. His bar roster address is 1011 Lehman Avenue, Suite 102, Bowling Green, Kentucky 42103.

Thornton and Harrison discussed two potential civil actions against Pendley: (1) assault, which carries a limitations period of one year, KRS 413.140; and (2) intentional infliction of emotional distress (IIED), which carries a limitations period of five years, KRS 413.120. Although Thornton contends that he and Harrison *agreed* to await the outcome of the criminal proceedings before determining which civil claim(s) to pursue, Harrison was under the impression that "she *would have to* wait for the criminal case to run its course" before she could pursue civil remedies. In any event, Harrison entered into a contingency fee contract with Thornton.

During the pendency of Pendley's criminal trial, Harrison frequently telephoned Thornton and left messages concerning her case.[2] She received a few phone calls in return, but no correspondence. Accordingly, there is no documentation or other evidence that Thornton informed Harrison that a cause of action for assault would be lost after the one-year statute of limitations had expired.

Pendley's criminal trial occurred in July 2000, well after the one-year limitations period for a civil assault claim had lapsed; he was convicted of the lesser offense of assault under extreme emotional distress. This lesser conviction indicated to Thornton that Harrison's IIED claim, her only viable claim at that point, was not "worth as much," and was therefore not worth pursuing. Moreover, he believed that Pendley would have few assets to satisfy

any judgment in Harrison's favor, and that Harrison would not make a very good witness.[3,4] Accordingly, although Harrison testified that nothing was ever said to her about *not* bringing a civil action, Thornton abandoned her judicial remedies.

Rather, Thornton and Harrison discussed pursuing compensation for medical bills and lost wages through the Crime Victims Compensation Board (CVCB). He asked Harrison to provide him with all of the materials needed to support a CVCB claim, which she sent to him via overnight mail.

Thornton testified that he considered his help with the CVCB claim to be *pro bono* because he did not have a fee agreement with Harrison for this representation. Thornton nevertheless billed her for reviewing the CVCB forms but provided no response as to whether the forms were satisfactory. In light of being billed, it was reasonable that Harrison believed Thornton was pursuing her CVCB claim. However, by November 2000, Harrison began getting nervous, and contacted other attorneys to investigate. She learned in 2001 that no claim had been filed with CVCB, and was advised by a CVCB employee that the statute of limitations had expired on any potential claim.[5]

In June 2001, Harrison filed a complaint with the KBA against Thornton; a month later, Thornton filed an answer. Thereafter, the KBA issued Thornton a subpoena requesting documents relating to his rep-

---

2. The Trial Commissioner opined that the calls were made "with such frequency as to result in annoyance."

3. Harrison had testified during Pendley's criminal trial. The prosecutor in the criminal trial testified before the Trial Commissioner in this case, agreeing that Harrison did not make a sympathetic witness.

4. The record reflects that Thornton was also concerned about Harrison's consensual sexual relationship with the assailant, and that alcohol was consumed on the night of her injuries.

5. She did, however, eventually effect a recovery from CVCB without Thornton's assistance. There is no indication that her recovery was diminished as a result of Thornton's inaction.

resentation of Harrison, but Thornton never responded. Thornton claims that the reason he did not respond to the subpoena was because "when he received something from the KBA ... he would emotionally shut down and was unable to respond to the KBA request." Indeed, he does not deny receiving correspondence from the KBA, but rather that "he probably had not opened up the envelope containing the documents, such as the subpoena duces tecum."[6]

In May 2004, Thornton was charged with violating the following provisions of the Kentucky Rules of Professional Conduct:[7] (1) SCR 3.130–1.1 (failure to provide competent representation); (2) SCR 3.130–1.3 (failure to act with reasonable diligence and promptness); (3) SCR 3.130–1.4 (failure to keep a client reasonably informed or promptly comply with requests for information); and (4) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority). The Trial Commissioner found that Thornton violated each of these provisions; on appeal, the Board of Governors agreed.

### B.  Charge 9528: Jennifer Batts

In February 2001, Jennifer Batts contacted Thornton to discuss divorcing her husband. Batts paid Thornton a $500 retainer—Thornton's fee for an *uncontested* divorce. Thornton told her that his retainer for a *contested* divorce was $1,000 (against which an hourly rate of $125 would be charged).

It became apparent early on that the divorce would be contested. Thornton contends that Batts was aware that she was required to pay an additional $500 (for a total of $1,000) before he would proceed with the contested divorce. Although Thornton alleges that he and Batts had a conversation to this effect, no correspondence was prepared explaining these requirements or incorporating the terms of the conversation. In fact, Batts contends that Thornton told her on three separate occasions that the two of them would work out an arrangement to get the extra $500 paid in installments.[8] On the other hand, Thornton introduced a memorandum' written by his assistant that stated the following:

> Per my discussion with [Thornton] a couple of weeks ago, he did not plan to work on this file until client paid $1,000 retainer. I advised client that she needed to pay the retainer before we would begin work on her divorce action and she indicated to me [Thornton] had agreed for her to make payments. I discussed this with [Thornton], and this was NOT the arrangement. I again notified Jennifer that she would need to pay the retainer before we would prepare any motions or agreements.
>
> I have not heard back from Jennifer....

Again, there is no correspondence or documentation of any direct conversation between Thornton and Batts concerning the fee arrangement.

---

6.  Thornton explained at his disciplinary hearing: "And what—what's going to be true about a lot of these things that I received by mail from the—from the bar is, for whatever reason, I had an inability to just process this. When I would get something from the bar I would just emotionally shut down.... and unfortunately, I may not have ever even opened the envelopes."

7.  All rules referenced are those in effect before the amendments effective July 15, 2009.

8.  Batts's deposition testimony included the following statement: "When I met with Mr. Thornton he had told me that a $500 up-front fee could be collected and that we would work the rest out. And so that's the payment that I made to him."

On May 16, 2001, Batts went to Thornton's office for a scheduled appointment. According to Batts, she waited for forty-five minutes, but Thornton never came out of his office. She therefore left without having met with him. Thornton, though, appears to have billed Batts for one hour of his time that day; the record does not, however, contain a copy of any bill with a description of the task or tasks that he performed for Batts on that date.

In September 2001, Batts and Thornton met to further discuss the divorce. Although only $500 had been paid, Thornton prepared documents for a contested divorce and issued Batts a bill in connection with their meeting and his work. The divorce action was not filed, however, because the additional retainer was not paid. Curiously, despite the fact that the additional $500 required by Thornton was never paid, he proceeded to perform work and exhaust the original $500 retainer.[9]

In November 2001, after becoming concerned about her husband's aggressive and threatening behavior, Batts filed a *pro se* emergency protective order. Batts testified that during the time period leading up to this incident, she had left messages with one of Thornton's employees but had never received a return call. However, she was not certain if she attempted to contact Thornton immediately prior to filing for the protective order.

Batts requested Thornton's assistance at a November 19 hearing on the protective order.[10] Thornton acknowledges that an arrangement was made for his firm to represent her at the hearing, although it is unclear as to when, with whom, and under what terms. Ultimately, one of Thornton's associates appeared with Batts at the hearing.[11]

Neither Thornton nor his firm provided any further representation to Batts. Batts contacted his office after the hearing, but

9. Billing statements show $375 was billed for meetings in April and May 2001. An additional $187.50 was charged for the September 2001 meeting, and the document preparation for a contested divorce (which was never filed). A billing statement showed that a $125 payment had been received toward the $187.50 balance, with $62.50 still being owed. The $125 was the remainder of the $500 retainer after charging $375 against it. Thus, after applying the $500 retainer, Batts continued to owe $62.50 for Thornton's counsel.

10. Batts's deposition testimony included the following:

> [I]'m a layperson, so in my mind, he had been hired as my attorney. This domestic violence action, you know, was on the part of my then-husband, which, in my, you know, non-legalese mind falls under the umbrella of a divorce. It was a, you know, an action that had taken place with my husband; I had hired Mr. Thornton as my attorney to represent me in my divorce. That, of course, had bearing on my marital status on my—you know, so in my mind,

> that—that's one issue.... I wasn't able to talk to Mr. Thornton. I had called several times and was never able to talk to him. I would call and leave messages, you know, and be told that he was on the other line and he wasn't in the office so I never was able to talk to him about it.... I had left messages with Mr. Thornton's office, those in excess of ten times that I had called, that this had happened; that I didn't know what to do; that we had a hearing coming up. Never had a reply. I didn't get a return phone call, I didn't get written correspondence. So the day of the hearing, I, in my uneducated, nonlegal mind, thought that my counsel would be there. And my name was moving up the docket and no one was there so I called Mr. Thornton's office and said I'm at the courthouse, the hearing is happening soon. And so they gave me the physical description of an attorney that would be sent to sit with me at this hearing.

11. Although it was an *associate* at Thornton's firm that represented her at the hearing, she was billed at the "partner" rate of $125 per hour.

received no response. By letter dated April 24, 2002, she formally terminated his representation of her, and asked him for a refund of $300. The letter states, "I met with you very briefly on two occasions and had accompaniment at my domestic violence hearing. These are the only contacts with your office. I do not feel these services constitute the $500.00 you have collected from me."[12] The letter was sent to Thornton's office via registered mail and was received there on April 29.

Also on April 29, Thornton's partner received a request to represent *Mr. Batts*,[13] who had been charged with a drug offense and was scheduled to appear in court that day. Thornton's partner was unable to attend Mr. Batts's hearing due to a scheduling conflict; instead, Thornton attended. Thornton was aware of Jennifer Batts's termination letter prior to attending the hearing. He also testified that he did not make a connection that the Mr. Batts in the drug offense matter was the same Mr. Batts who was Jennifer Batts's husband, with whom he had met approximately one year earlier in April 2001.

Batts filed a complaint with the KBA against Thornton in June 2002; Thornton responded to the complaint the following month. During its investigation, the KBA requested files and information from Thornton, but Thornton never responded to those requests. Thus, the KBA served Thornton a subpoena requesting copies of client files and other information related to the investigation, but Thornton never responded due to his tendency to "emotional-

ly shut down" when receiving correspondence from the KBA.

Thornton was charged with violating the following provisions of the Kentucky Rules of Professional Conduct: (1) SCR 3.130–1.4 (failure to keep a client reasonably informed or promptly comply with reasonable requests for information); (2) SCR 3.130–1.5(a) (failure to charge a reasonable fee); (3) SCR 3.130–1.7 (conflict of interest in representing current client); and (4) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority). The Trial Commissioner found that Thornton violated SCR 3.130–1.4, –1.5(a), and –8.1(b), but *not* SCR 3.130–1.7; on appeal, the KBA's Board of Governors agreed.

## C. Charge 9651: Ralph Guthrie

In November 2000, Ralph Guthrie contacted Thornton for advice related to the death of Guthrie's son, Brandon, who had been killed in a single vehicle accident while riding as a passenger. Thornton had previously represented Brandon in 1998; at the time of his death, Brandon owed Thornton $460. Guthrie and Thornton discussed the probate of Brandon's estate, as well as possible criminal and wrongful death actions against the driver.

Thornton alleges that his fee was discussed at this initial meeting. The fee was to be "a one-third contingency fee agreement," although no written contingency fee agreement exists, and Guthrie disputes that any such agreement was discussed at the meeting.[14]

---

12. Thornton later sent a letter to the KBA stating that he would refund whatever amount Batts thought was fair. Batts confirmed that she requested $300 in two subsequent letters, but Thornton never refunded any money.

13. Mr. Batts's father made the request.

14. In a letter to Thornton dated June 21, 2002, Guthrie stated, "[w]hile the fee charged may be the standard percentage for your services, I was never made aware of this amount prior to our conversation on 06/13/02. I feel I should have been told that you would receive 1/3 of any settlement when I was in your office in November 2000."

The driver of the automobile in which Brandon was killed was indicted in February 2001 for, among other things, murder. Thornton advised Guthrie and Lesia Carrubba, Brandon's mother, that he "would prefer not to have [the wrongful death case] resolved until the criminal case [was] completed."

In April 2001, Guthrie forwarded correspondence from the driver's insurer to Thornton. Thornton was also contacted directly by the insurer's claim representative—in a letter dated October 5, 2001, the insurer provided Thornton with his requested copy of the declarations page of the applicable policy. The insurer also contacted Thornton in January 2002 and offered to resolve the death claim for the policy limit of $25,000. The correspondence requested additional information, including the death certificate and letters of administration. Thornton forwarded this letter to Guthrie and Carrubba on January 14, 2002, along with a note requesting them to call his secretary and schedule a telephone conference to discuss the insurer's offer. Although Guthrie arranged to be available on February 14 to speak with Thornton, the call never occurred, and Guthrie heard nothing from Thornton's office until June 2002, despite several attempts to contact Thornton by phone.[15]

By February 14, 2002 (the date the scheduled telephone conference did not occur), Guthrie and Carrubba decided to resolve the death claim with the insurer. Carrubba sent the insurer the requested documents, and the insurer later forwarded the settlement draft to Thornton. A $25,000 check was forwarded to Guthrie for endorsement. Thereafter, a settlement statement with Guthrie's share of the settlement proceeds was sent to him; the statement reflected the total settlement of $25,000 (although $1,905.82 had been withheld from the settlement amount for medical bills).[16] Guthrie and Carrubba each received $7,150, while Thornton received $8,333.33 for his one-third share. In addition, Thornton recovered the $460 that the late Brandon Guthrie owed him at the time of his death, even though Thornton had filed no claim against the estate for that amount.[17]

Guthrie refused to sign the settlement statement because it would have "implied that [he] was completely satisfied with [Thornton's] services and the fee charged." Instead, he sent a letter to Thornton complaining of the fee, and stating that a June 2002 telephone conversation with Thornton was the first he had heard of the one-third fee being charged for this matter.[18]

15. Guthrie stated that "[t]here were a number of calls from myself to Mr. Thornton's office and I spoke with his secretary ... and left messages numerous times to have Mr. Thornton call. And I never received a return call."

16. Apparently because no claim had yet been filed with the insurer for no fault benefits, a sum in the amount of the medical bills was withheld from the settlement. The withheld amount was eventually released when no fault benefits were paid in October 2002.

17. Thornton later acknowledged that "but for an agreement," the $460 should not have been deducted from the settlement proceeds. However, he contended that they had "a very specific agreement about that," although

Thornton produced no correspondence or documentation memorializing the agreement, nor offered any details as to when such an understanding was reached. And although Thornton stated that Guthrie and Carrubba had been receiving a monthly bill from his office for the entire period of time since the $460 was due, Guthrie disputed that claim and no such bills were introduced to the Trial Commissioner. Guthrie did not even know what the $460 represented.

18. *See supra* note 14. In his June 2002 letter, Guthrie stated that in eighteen months of representation, he received only two return phone calls from Thornton. Furthermore, after the February 2002 telephone conference

In October 2002, the KBA served a complaint upon Thornton; he filed no response. In June 2003, the KBA served a subpoena for documents and other information relating to his representation of Guthrie. Once again, he filed no response to the subpoena due to his tendency to "emotionally shut down" when receiving correspondence from the KBA.

Thornton was charged with violating the following provisions of Kentucky's Rules of Professional Conduct: (1) SCR 3.130–1.1 (failure to provide competent representation); (2) SCR 3.130–1.3 (failure to act with reasonable diligence in representing a client); (3) SCR 3.130–1.4 (failure to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); (4) SCR 3.130–1.5(c) (failure to have a contingent fee agreement in writing); (5) SCR 3.130–1.5(a) (failure to charge a reasonable fee); and (6) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority). The Trial Commissioner found that Thornton violated SCR 3.130–1.1, –1.4, –1.5(c), and –8.1(b), but *not* SCR 3.130–1.3 or –1.5(a); [19] on appeal, the KBA's Board of Governors agreed.[20]

## II. ANALYSIS

"The findings of fact by the . . . Board of Governors in a disciplinary proceeding are advisory only." *Kentucky Bar Ass'n v. Berry,* 626 S.W.2d 632, 633 (Ky. 1981). "Final decisions of guilt and punishment can only be made by the Supreme Court, and it is done on the basis of a de novo consideration of pleadings and trial review." *Kentucky Bar Ass'n v. Jones,* 759 S.W.2d 61, 64 (Ky.1988).

### A. Charge 8632: Lesa Harrison

The Inquiry Commission charged Thornton with violating four provisions of the Kentucky Rules of Professional Conduct while representing Lesa Harrison: (1) SCR 3.130–1.1 (failure to provide competent representation); (2) SCR 3.130–1.3 (failure to act with reasonable diligence and promptness); (3) SCR 3.130–1.4 (failure to keep a client reasonably informed or promptly comply with requests for information); and (4) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from disciplinary authority). We discuss each in turn.

### 1. SCR 3.130–1.1—Failure to Provide Competent Representation

First, Thornton was charged with failing to provide Lesa Harrison competent representation. SCR 3.130–1.1 states: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." *See Myles v. Kentucky Bar Ass'n,* 289 S.W.3d 561, 564 (Ky.2009) (finding a violation of SCR 3.130–1.1 where attorney failed to file claim before limitations period expired); *Kentucky Bar Ass'n v. Griffith,* 186 S.W.3d 739, 740 (Ky.2006) (same).

Harrison retained Thornton to represent her in recovering medical costs resulting from an assault that resulted in serious

---

call never occurred, Guthrie did not hear from Thornton at all until the June 2002 phone call. Finally, Guthrie requested a written response to his June 2002 letter from Thornton, but received none.

**19.** The Trial Commissioner asserted that our decision in *Kentucky Bar Association v. Womack,* 269 S.W.3d 409 (Ky.2008) "indicates that a violation under SCR 3.130–1.5(c) precludes a finding under SCR 3.130–1.5(a)."

**20.** A majority of the Board also agreed that our decision in *Womack* indicates that a violation under SCR 3.130–1.5(c) precludes a finding under SCR 3.130–1.5(a).

physical injuries to her face. At their initial December 1997 meeting, they discussed two potential civil claims: assault and IIED. Thornton claims that he and Harrison agreed to await the outcome of Pendley's criminal trial to pursue any civil claim; Harrison contends that she was under the impression that she *must* wait until the criminal trial was complete before she could pursue her civil claims.

Nothing in the record indicates that Harrison was aware of, and consented to, delaying the filing of any civil action at the expense of losing a claim. Similarly, nothing in the record reflects that she was aware of the significance of any limitations period. Thornton permitted the limitations period to expire on the only civil claim from which Harrison could have been compensated for her physical injuries—a claim for civil assault (or battery). The record reflects that Harrison first learned that her claims were affected by the running of a limitations period after speaking with another attorney in 2000.

Furthermore, although Thornton made Harrison aware of the administrative remedies available, he did nothing to secure compensation from CVCB. Harrison sent Thornton the pictures, police reports, and other materials via overnight mail, as requested, so that Thornton could submit them to CVCB. And although she received a bill from Thornton for work allegedly conducted pursuant to this administrative remedy, Harrison later learned that Thornton never filed her claim with CVCB.

■ In short, Harrison hired Thornton to help recover medical costs and lost wages, and he did virtually nothing in pur-

suit of such. We therefore conclude that Thornton failed to provide competent representation to Harrison in violation of SCR 3.130–1.1 for allowing the limitations period for her claim for assault/battery claim to expire without her knowledge or consent, and for subsequently failing to pursue her administrative remedies through CVCB.[21]

### 2. SCR 3.130–1.3—Failure to Act with Reasonable Diligence and Promptness

Next, Thornton is charged with failing to act with reasonable diligence and promptness in representing Harrison. SCR 3.130–1.3 states: "A lawyer shall act with reasonable diligence and promptness in representing a client." Comment 2 to SCR 3.130–1.3 states:

> Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, *as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed.* Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

(Emphasis added). *See also Trainor v. Kentucky Bar Ass'n*, 311 S.W.3d 719, 720 (Ky.2010) (finding violation of SCR 3.130–1.3 where attorney failed to file claim prior to expiration of statute of limitations).

■ Thornton permitted the limitations period on Harrison's civil assault (or battery) cause of action to expire without first filing a claim. Moreover, although he so-

---

**21.** Although the record reflects that a CVCB employee notified Harrison that the limitations period for her administrative claim had expired, she ultimately secured a recovery from CVCB. Thus, we cannot conclude that Thornton's incompetence prevented Harrison from recovering from CVCB. Rather, his failure to pursue those claims/remedies evinces incompetence.

licited materials from Harrison to file an administrative claim with CVCB, he failed to file that claim.

We conclude that Thornton failed to act with reasonable diligence and promptness in representing Harrison in violation of SCR 3.130–1.3 when he permitted the limitations period on her civil judicial claim to lapse, and when he failed to file a claim with CVCB.

### 3. SCR 3.130–1.4—Failure to Keep a Client Reasonably Informed or Promptly Comply with Requests for Information

Next, Thornton is charged with failing to keep Harrison reasonably informed or promptly comply with her requests for information. SCR 3.130–1.4 states: "(a) A lawyer should keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer should explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *See Kentucky Bar Ass'n v. Geller,* 133 S.W.3d 473, 473–74 (Ky.2004) (finding violation of SCR 3.130–1.4(a) where attorney repeatedly failed to respond to phone calls, and for misadvising client when he finally did respond).

■ The record reflects that Harrison attempted to contact Thornton by telephone several times, and left several messages for him concerning her case. This gave Thornton ample opportunity to keep Harrison "reasonably informed," and explain to her that waiting for Pendley's criminal trial to conclude may result in a loss of her civil assault claim. However, he failed to do so. Moreover, there is no indication that Thornton advised her of his reservations that she might not be a good witness, that she had a consensual sexual relationship with Pendley, that alcohol was consumed the night of her injuries, and that there was little chance Pendley had

assets to satisfy a judgment in her favor. Similarly, there is nothing to indicate that she was advised that the outcome of the criminal proceedings could dissuade Thornton from taking action on her behalf.

We conclude that Thornton failed to keep Harrison reasonably informed about the status of her claim in violation of SCR 3.130–1.4(a). We also find a violation of this provision in his failure to inform Harrison of the status of her CVCB claim— i.e., unfiled. Further, we find a violation of SCR 3.130–1.4(b) in that he failed to explain the potential consequences of waiting for Pendley's criminal trial to conclude before filing her civil claim, thereby preventing her from making an informed decision regarding the representation.

### 4. SCR 3.130–8.1(b)—Failure to Respond to a Lawful Demand for Information from a Disciplinary Authority

■ Finally, Thornton is charged with failing to respond to a lawful demand for information from a disciplinary authority. SCR 3.130–8.1(b) states: "[A] lawyer ... in connection with a disciplinary matter, shall not ... knowingly fail to respond to a lawful demand for information from a[ ] ... disciplinary authority...." *See Kentucky Bar Ass'n v. Smith,* 283 S.W.3d 738, 740 (Ky.2009) (acknowledging an attorney's previous violation of SCR 3.130– 8.1(b) for not responding to a subpoena *duces tecum* ).

Thornton admits that he did not respond to a subpoena *duces tecum* issued by the Inquiry Commission for files pertaining to his representation of Lesa Harrison. We conclude that this establishes a violation of a SCR 3.130–8.1(b).

### B. Charge 9528: Jennifer Batts

The Inquiry Commission charged Thornton with violating four provisions of the Kentucky Rules of Professional Con-

duct in his representation of Jennifer Batts: (1) SCR 3.130–1.4 (failure to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); (2) SCR 3.130–1.5(a) (failure to charge a reasonable fee); (3) SCR 3.130–1.7 (conflict of interest representing current client); and (4) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from disciplinary authority). We discuss each in turn.

### 1. SCR 3.130–1.4—Failure to Keep a Client Reasonably Informed or Promptly Comply with Requests for Information

■ First, Thornton is charged with failure to keep Batts reasonably informed or promptly comply with her requests for information. SCR 3.130–1.4 states: "(a) A lawyer should keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer should explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *See Sykes v. Kentucky Bar Ass'n,* 968 S.W.2d 90, 91 (Ky.1998) (finding violation of SCR 3.130–1.4 where client paid $500 retainer but attorney failed to do appropriate legal work).

Thornton did not proceed with Batts's divorce action because she had paid only $500 toward the required $1,000 retainer for a contested divorce. However, Batts was under the impression, caused by Thornton, that she had paid enough for the case to proceed. This assumption was rea-

sonable in light of the facts that (1) Thornton prepared the documents for a contested divorce, and (2) he was drawing from her $500 retainer, as evidenced by a November 2001 bill. That Batts was under this misimpression shows that Thornton also violated SCR 3.130–1.4(b) by failing to explain the matter of legal fees to an extent reasonably necessary to permit Batts to make an informed decision on how to proceed.[22] *See* 7A C.J.S. § 378 (stating "since lawyers almost always possess more sophisticated understanding of fee arrangements, it is therefore appropriate to place the balance of the burden of fair dealing and the allotment of risk in the hands of the lawyer in regard to fee arrangements with clients, *as well as to state clearly the terms of the fee arrangement*") (emphasis added) (citations omitted).

We therefore conclude that Thornton failed to keep Jennifer Batts reasonably informed about the status of her divorce action in violation of SCR 3.130–1.4.

### 2. SCR 1.5(a)—Failure to Charge a Reasonable Fee

Next, Thornton is charged with failure to charge Batts a reasonable fee. SCR 3.130–1.5(a) states: "A lawyer's fee shall be reasonable." Accordingly,

[a]n agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interests. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is

---

**22.** We note here that Thornton was aware of Batts's misimpression, as evidenced by his assistant's memorandum. The memo stated that Batts was under the impression that Thornton would accept payments toward the outstanding $500, and that Thornton would proceed with her case in the meantime. Although the memo reflects that that was not

the arrangement Thornton had intended, and that the assistant attempted to inform Batts of this, there is no correspondence or documentation of any direct conversation between Thornton and Batts concerning the fee arrangement *despite* the fact that Thornton was aware of Batts's misimpression.

foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction. SCR 3.130–1.5, Comment [3]. *See also* 7A C.J.S. § 404 (stating "[c]ompensation paid to attorneys for legal services is largely a question of fundamental fairness, and above all else, a lawyer's fee must be reasonable") (citations omitted).

Thornton accepted Batts's $500 retainer for an uncontested divorce, but discovered very early on in his representation that the Batts' divorce would be contested. His retainer for contested divorces was $1,000. Without having secured payment of the additional $500, Thornton consumed and exhausted the original $500 retainer, knowing that more extensive services would be required to complete the job for which he was hired. Moreover, Thornton knew that Batts may have trouble securing the additional $500, as one of the issues in the divorce was the significant debt that the couple had acquired during the marriage.

█ As the Commentary to SCR 3.130–1.5 explains, a lawyer cannot accept a partial retainer knowing that extensive services will be required, exhaust that partial retainer, and then curtail services until the rest of the retainer is paid, if ever. Batts was placed in the situation of having no choice but to bargain for further assistance in the midst of a proceeding in order for the divorce to be filed. This scenario is unreasonable, a conclusion that is reinforced by the fact that we have been unable to find any case, from this Common-

wealth or any other jurisdiction, in which a similar arrangement existed.[23] We therefore conclude that Thornton charged Batts an unreasonable fee in violation of SCR 3.130–1.5. In fact, Thornton all but conceded this point when he agreed to refund Batts whatever amount she thought was fair.

### 3. SCR 3.130–1.7—Conflict of Interest in Representing Current Client

Thornton was charged with representing a client with whom he had a conflict of interest. SCR 3.130–1.7 states, in relevant part: "(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client.... (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client...."

Thornton received Batts's letter terminating his representation on April 29, 2002. That same day, he undertook representation of her husband in a criminal matter. Thornton testified that he was aware of the termination letter prior to attending court with Mr. Batts, and that he did not represent Mr. Batts at any time during which he provided counsel to Jennifer Batts. Moreover, there is no indication that Thornton used or divulged any information obtained in representing Jennifer Batts during his representation of Mr. Batts, or that his representation of Mr. Batts was otherwise materially limited by his prior representation of Jennifer.

█ Although it is unclear precisely when an attorney-client relationship arose between Thornton and Mr. Batts, upon the record before us, we conclude that Thorn-

---

**23.** As the Board of Governors noted, Thornton "may have been justified in terminating the relationship if the representation resulted in an unreasonable financial burden to him. In that situation, any unearned portion of the retainer could have been returned. Instead, Respondent consumed the retainer by providing limited services, knowing more extensive services would be required."

ton did not violate SCR 3.130–1.7, as his representation of neither Mr. Batts nor Jennifer Batts was directly adverse to another client. Moreover, Thornton's representation of neither Mr. Batts nor Jennifer Batts was materially limited by his responsibilities to the other.

### 4. SCR 3.130–8.1(b)—Failure to Respond to a Lawful Demand for Information from a Disciplinary Authority

Thornton was charged with failing to respond to a lawful demand for information from a disciplinary authority. SCR 3.130–8.1(b) states: "[A] lawyer . . . in connection with a disciplinary matter, shall not . . . knowingly fail to respond to a lawful demand for information from a[ ] . . . disciplinary authority. . . ." *See Smith*, 283 S.W.3d at 740 (acknowledging an attorney's previous violation of SCR 3.130–8.1(b) for not responding to a subpoena *duces tecum*).

Thornton admits that he did not respond to a subpoena *duces tecum* issued by the Inquiry Commission for files pertaining to his representation of Jennifer Batts. We conclude that this establishes a violation of SCR 3.130–8.1(b).

### C. Charge 9651: Ralph Guthrie

The Inquiry Commission charged Thornton with violating six provisions of the Kentucky Rules of Professional Conduct in his representation of Ralph Guthrie: (1) SCR 3.130–1.1 (failure to provide competent representation); (2) SCR 3.130–1.3 (failure to act with reasonable diligence in representing a client); (3) SCR 3.130–1.4 (failure to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); (4) SCR 3.130–1.5(c) (failure to have a contingent fee agreement in writing); (5) SCR 3.130–1.5(a) (failure to charge a reasonable fee); and (6) SCR 3.130–8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority).

### 1. SCR 3.130–1.1—Failure to Provide Competent Representation

Thornton was charged with failing to provide Ralph Guthrie competent representation. SCR 3.130–1.1 states: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

■■■ Guthrie settled with the insurance carrier for $25,000. Thornton collected his one-third contingency fee *and* charged an additional $460. The $460 was owed to him by the decedent, Brandon Guthrie: The Trial Commissioner and the Board of Governors concluded that Thornton violated this provision by "not provid[ing] information which allowed [Guthrie] to participate intelligently in any decision as to whether the payment of the $460.00 was proper." We disagree.

■■■ SCR 3.130–1.1 requires attorneys to provide "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Charging an additional $460 against an insurance settlement without explaining why is not indicative of Thornton's incompetence; rather, it is strong evidence of a violation of SCR 3.130–1.4(b): failure to "explain a matter reasonably necessary to permit the client to make informed decisions regarding the representation." As administrator of his son's estate, Guthrie was entitled to information which would allow him to intelligently distribute the settlement funds properly. Thornton withheld that information, and in doing so violated SCR 3.130–1.4(b), but did *not* violate SCR 3.130–1.1. Therefore, we conclude that Thornton did not fail to provide Guthrie with competent representation.

## 2. SCR 3.130–1.3—Failure to Act with Reasonable Diligence

Next, Thornton was charged with failing to act diligently in representing Ralph Guthrie. SCR 3.130–1.3 states: "A lawyer shall act with reasonable diligence and promptness in representing a client."

The only evidence tending to support the conclusion that Thornton did not act with reasonable diligence and promptness is that (1) he never filed a civil action on behalf of Guthrie, and (2) he did not supply the insurance provider with the requested documents. However, the original agreement between Thornton and Guthrie was that they would await the outcome of the criminal trial before pursuing a civil claim, which would explain why he never filed a civil action *and* why he did not supply the insurer with the requested documents. Both the Trial Commissioner and Board of Governors concluded that Thornton did not violate his duty under SCR 3.130–1.3 to act with reasonable diligence and promptness. We agree.

## 3. SCR 3.130–1.4—Failure to Keep a Client Reasonably Informed or Promptly Comply with Requests for Information

Thornton was charged with failing to keep Guthrie advised of the status of the subject matter of the representation. SCR 3.130–1.4 states: "(a) A lawyer should keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer should explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *See Beal v. Kentucky Bar Ass'n,* 220 S.W.3d 690, 690 (Ky.2007) (finding a violation of SCR 3.130–1.4 where attorney failed to respond to a letter from client asking that attorney refund unearned fee).

Guthrie stated that he spoke with Thornton, on occasion, about the subject matter of his representation. However, the scheduled telephone conference of February 14, 2002, which Thornton himself requested and was related to a matter of significance, never occurred. Thereafter, Guthrie left several messages for Thornton, but there was no response. Nor did Thornton reply to Guthrie's June 21, 2002 letter—a letter that raised serious questions regarding the fee Thornton was charging and requested a written response. Finally, as noted above in Section (II)(c)(*l* ), Thornton failed to explain the $460 charge against the settlement funds to allow Guthrie to make an informed decision as to whether Thornton was entitled to it.

We therefore conclude that Thornton failed to keep Guthrie reasonably informed about the status of his case, and failed to explain a matter to the extent reasonably necessary to permit Guthrie to make an informed decision regarding the representation, in violation of SCR 3.130–1.4.

## 4. SCR 3.130–1.5(c)—Failure to Have Contingency Fee Agreement in Writing

Next, Thornton was charged with failing to memorialize a contingency fee agreement in writing. Supreme Court Rule 3.130–1.5(c) states, in relevant part: "A fee may be contingent on the outcome of the matter for which the service is rendered. . . . Such a fee must meet the requirements of Rule 1.5(a). A contingent fee agreement shall be in writing. . . ."

It is undisputed that there was no written fee agreement, and no explanation of the method by which the fee was to be calculated. Nevertheless, Thornton collected one-third of the settlement fund provided by the insurance company. Although Guthrie obviously believed the fee was improper, Thornton offered no justification, much less a refund.

We conclude that Thornton failed to reduce a contingency fee agreement to writing in violation of SCR 3.130–1.5(c). It was therefore improper for Thornton to collect the one-third contingency fee.

### 5. SCR 3.130–1.5(a)—Failure to Charge a Reasonable Fee

Next, Thornton was charged with failing to charge a reasonable fee with respect to his representation of Guthrie. SCR 3.130–1.5(a) states: "A lawyer's fee shall be reasonable." The Trial Commissioner and a majority of the KBA Board of Governors concluded that our decision in *Kentucky Bar Association v. Womack*, 269 S.W.3d 409 (Ky.2008) indicates that a violation under SCR 3.130–1.5(c) precludes a finding under SCR 3.130–1.5(a).

In *Womack*, an attorney represented a married couple in a foreclosure action. 269 S.W.3d at 410. While the attorney claimed that the husband asked him to take it on a contingency fee basis, no agreement was ever memorialized in writing. *Id.* Moreover, the husband had originally paid $300 toward the representation, against which the attorney had charged for his services. *Id.* The foreclosure sale garnered a surplus of $67,893.54—half of which was owed to the husband and half of which was owed to the wife.[24] *Id.* The IRS had a tax lien against the husband in excess of his share; however, the wife's share was not affected by the lien. *Id.* Thus, she was to receive $33,946.77. *Id.* The attorney took a 20% contingency fee,[25] or $6,789.35, and distributed the remaining $27,157.42 to the wife. *Id.* at 411. The couple filed a bar complaint against the attorney, alleging that he charged a contingency fee without a written contract to do so, and that they believed that an hourly wage would be charged. *Id.*

The KBA Board of Governors found that the attorney was guilty of violating SCR 3.130–1.5(c) by a vote of 17–0; however, the Board was split as to whether the attorney was also guilty of violating SCR 3.130–1.5(a).[26] *Id.* at 412. Bar Counsel therefore filed a notice of review in this Court to determine whether the attorney was guilty of violating SCR 3.130–1.5(a)—failure to charge a reasonable fee. *Id.* at 413. We found the attorney not guilty, stating:

> The claim that he charged an unreasonable contingency fee assumes that he was entitled to charge *some* contingency fee. However, because he did not have a *written agreement* with the [couple], as alleged in Count II [the contingency fee count], he was *not* entitled to charge a contingency fee and could charge only according to his hourly rate.... A finding of guilt under Count I [the failure to charge a reasonable fee count] would essentially be a finding that he was guilty of an ethical violation on a non-existing contingency fee....

269 S.W.3d at 413–14. Thus, because the contingency fee arrangement was invalid, he could not collect that fee, and that amount could therefore not be "unreasonable." Rather, he could charge only an hourly rate.

We hold that the principles enunciated in *Womack* apply here, and that an

---

24. The property was owned jointly by the husband and wife.

25. The attorney sent a letter to the wife stating that the customary rate was one-third of the amount, but that he had "chosen to reduce this amount to 20%, which should leave [her] substantially more."

26. The vote was 10–7 in favor of finding him guilty on this charge, which is short of the eleven (11) *or* three-fourths (3/4), whichever is less, required by SCR 3.370(6).

invalid contingency fee cannot be the basis of a SCR 3.130–1.5(a) failure to charge a reasonable fee violation. Thornton's contingency fee arrangement was not reduced to writing; it was therefore invalid in violation of SCR 3.130–1.5(c); he therefore cannot collect the contingency fee; and there is therefore no fee that is capable of being unreasonable in violation. of SCR 3.130–1.5(a). Thornton is entitled to his hourly rate for any work done pursuant to his representation of Guthrie. The Trial Commissioner noted the following: .

> With respect to the wrongful death claim, there is no indication that liability was contested, any sophisticated legal issues were involved, or that any strenuous bargaining was required for the carrier to offer the $25,000. Documents required by the insurer were provided by Ms. Carrubba. Similarly, there is no indication that any matters related to processing the estate itself were particularly complicated or time-consuming. In this situation, 10 hours of time, or a fee of $1250, should have been plenty.

We are inclined to agree.

### 6.  SCR 3.130–8.1(b)—Failure to Respond to a Lawful Demand for Information from a Disciplinary Authority

Finally, Thornton was charged with failing to respond to a lawful demand for information from a disciplinary authority. SCR 3.130–8.1(b) states: "[A] lawyer ... in connection with a disciplinary matter, shall not ... knowingly fail to respond to a lawful demand for information from a[ ] ... disciplinary authority...." *See Smith*, 283 S.W.3d at 740 (acknowledging an attorney's previous violation of SCR 3.130–8.1(b) for not responding to a subpoena *duces tecum* ).

Thornton admits that he did not respond to a subpoena *duces tecum* issued by the Inquiry Commission for files pertaining to his representation of Ralph Guthrie. He also failed to respond to the KBA's complaint against him. We conclude that this establishes a violation of a SCR 3.130–8.1(b).

### D.  Summary

In sum, we find Thornton violated SCR 3.130–1.1 (competency), –1.3 (diligence), –1.4 (communication), and –8.1(b) (failure to respond) with respect to his representation of Lesa Harrison. We further find that he violated SCR 3.130–1.4 (communication), –1.5(a) (reasonable fee), and –8.1(b) (failure to respond) with respect to his representation of Jennifer Batts, but we find that he did not violate SCR 3.130–1.7 (conflict of interest) in that representation. Finally, we find that he violated SCR 3.130–1.4 (communication), –1.5(c) (contingency fee), and –8.1(b) (failure to respond) with respect to his representation of Ralph Guthrie, but we find that he did not violate SCR 3.130–1.1 (competency), –1.3 (diligence), or 1.5(a) (reasonable fee) in that representation.

### III.  DISCIPLINE

■ Having adjudged Thornton guilty of ten of the fourteen violations charged against him, we must now determine the appropriate sanction. In addition to considering the quantity and severity of his violations, we must also consider any aggravating and mitigating circumstances.

■ Aggravating factors include: (1) a dishonest or selfish motive in taking excessive fees from Guthrie and failing to follow through on a promised refund to Batts; [27] (2) a pattern of misconduct in that each of the three charges reflects minimal communication after retention resulting in negative consequences to the client, as well as

---

27.  *See supra* note 12.

confusing and/or improper billing for services; (3) multiple offenses with respect to each charge; (4) indifference to making restitution in that he has failed to make any effort to refund excessive or improper fees collected from his clients, even after stating that he would refund part of the advance fee to Jennifer Batts and admitting that there was no written contingency fee agreement with Ralph Guthrie; (5) substantial experience in the practice of law;[28] and (6) three instances of prior discipline.

Thornton's disciplinary record reveals a pattern of similar behavior. In April 2007, Thornton received a Private Admonition for violations of SCR 3.130–8.1(b) (failure to respond to a lawful demand for information) while serving as counsel for another attorney in a disciplinary matter. In June 2008, Thornton again received a Private Admonition for violating SCR 3.130–1.3 (diligence), –1.4(a) (failing to keep a client reasonably informed about the status of a matter or promptly complying with reasonable requests for information), –1.4(b) (failing to explain a matter to extent necessary for informed decision), and –1.5(c) (failure to provide a written statement showing remittance and method of determination upon recovery). Finally, in March 2009, Thornton received a Public Reprimand for violating SCR 3.130–1.5(b) (failing to explain fee to first-time client) and –8.1(b) (failing to respond to Bar complaint). Thornton's disciplinary history reinforces the fact that he has exhibited a pattern of misconduct. Even more troubling is the fact that these other three instances of misconduct occurred *after* the institution of the instant proceedings.

We further note that, although not an "aggravating" factor, Thornton's tendency to emotionally shut down when he receives correspondence from the KBA is unsettling and a very serious concern to this Court. Although Thornton asserts that he has "addressed and corrected" this issue, he has not demonstrated any affirmative steps or otherwise explained how this issue was addressed and corrected.

Thornton's violations are mitigated somewhat by the introduction of character evidence on his behalf. First, a domestic relations attorney who has been opposing counsel to Thornton in many divorce cases, as well as a mediator for proceedings in which Thornton has been counsel to one of the parties, testified to Thornton's character and reputation in the Warren County community as one of honesty and integrity. Second, a Commonwealth's Attorney who had prosecuted "dozens" of cases in which Thornton had been defense counsel also testified to Thornton's reputation for honesty and integrity.

Based upon the foregoing, the Trial Commissioner recommended: (1) suspension from the practice of law for 181 days; (2) reimbursement to Jennifer Batts in the amount of $300 plus statutory interest; (3) reimbursement to Ralph Guthrie and Lesia Carrubba in the amount of $7,083[29] plus statutory interest; and (4) that Thornton pay all costs associated with these proceedings. The KBA Board of Governors adopted those recommendations *in toto*. After careful deliberation, we adopt the recommendation of the Board of Governors, and it is hereby ORDERED that

---

28. As noted, *supra* note 1, Thornton was admitted to the Kentucky Bar on November 1, 1983.

29. As explained by the Trial Commissioner, "[t]his amount is determined by subtracting a reasonable fee, $1250 ($125/hour × 10 hours), from $8333 the fee charged in connection with the death claim."

1. Steven O. Thornton is suspended from the practice of law for 181 days for his professional misconduct as set forth herein. The suspension shall commence on the date of entry of this order and shall continue until such time as he is reinstated to the practice of law by order of this Court pursuant to SCR 3.510.[30]

2. Pursuant to SCR 3.390, Thornton shall, within ten days from the entry of this Opinion and Order: (a) notify, in writing, all clients of his inability to represent them, and of the necessity and urgency of promptly retaining new counsel; (b) notify, in writing, all courts in which he has matters pending of his suspension from the practice of law; (c) provide a copy of all such letters of notification to the Office of Bar Counsel; and (d) to the extent possible, immediately cancel and cease any advertising activities in which he is engaged.

3. Thornton shall immediately refund to Jennifer Batts $300 (plus interest at the legal interest rate stated in KRS 360.010, calculated from the date the bar complaint was filed).

4. Thornton shall immediately refund to Ralph Guthrie and Lesia Carrubba $7,083 (plus interest at the legal interest rate stated in KRS 360.010, calculated from the date the bar complaint was filed).

5. Thornton shall pay all costs associated with these disciplinary proceedings pursuant to SCR 3.450.

ABRAMSON, CUNNINGHAM, NOBLE, SCHRODER, SCOTT, and VENTERS, JJ., sitting. All concur. MINTON, C.J., not sitting.

ENTERED: February 21, 2013.

/s/ <u>Mary C. Noble</u>

---

**30.** SCR 3.5.10(1) states, in part, that "[n]o former member of the [Kentucky Bar] Association who has been suspended for a disciplinary case for more than one hundred eighty (180) days shall resume practice until he/she is reinstated by order of the Court."

SCR 3.510(3) states, in part, that "[i]f the period of suspension has prevailed for more than one hundred eighty (180) days, the matter shall be referred to the Character and Fitness Committee for proceedings under SCR 2.300. The Character and Fitness Committee will determine whether the application of a member who has been suspended for ... more than one hundred eighty (180) days, should be approved."

In light of the seriousness of Thornton's tendency to "emotionally shut down" when he receives correspondence from the KBA, we believe his reinstatement to practice law in the Commonwealth must be contingent upon the approval of the Character and Fitness Committee.